IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. A. No. 06-CV-0029 |
| DEPARTMENT OF JUSTICE, | ) ) ) |
| Defendant. | ) ) ) ) |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002.

Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge

Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom

of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From

October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and

routinely worked FOIA matters. I am an attorney and have been licensed to practice law in the

State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 257

1

employees who staff a total of ten (10) units and a field operational service center unit whose collective mission is to effectively plan, develop, direct and manage responses to requests for access to FBI records and information pursuant to the FOIA; Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General and FBI policies and procedures; judicial decisions and other Presidential and Congressional directives.  My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 12958, as amended,[1] and the preparation of affidavits/declarations in support of Exemption 1 claims asserted under the FOIA.[2]  I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 12958, as amended, §§ 1.3 and 3.1.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.  Specifically, I am aware of the treatment which has been afforded plaintiff's FOIA request to FBIHQ for the expedited release of agency records related to matters of possible intelligence misconduct reported or considered for reporting to the Intelligence Oversight Board ("IOB").

(4)    The purpose of this declaration is to provide the Court and plaintiff with an overview of the FBI's RIDS, explain the FBI's record keeping system, and outline all the FBI's

---

[1] 60 Fed. Reg. 19825 (1995) and 69 Fed. Reg. 15315 (2003).

[2] 5 U.S.C. § 552 (b)(1).

efforts to expedite plaintiff's request in response to <u>Plaintiff's Motion to Compel Expedited</u>
<u>Processing of Plaintiff's Freedom of Information Act Request.</u>

## OVERVIEW OF THE FBI'S FOIA PROCEDURE

### A. HOW A FOIA REQUEST IS PROCESSED IN RIDS

(5) Over the years, the FOIA Section at FBIHQ has engaged in a continual re-
engineering process in an effort to better serve the needs of requesters who seek information
from the FBI. In 2002, reorganization of various divisions at FBIHQ resulted in the formation of
the Records Management Division, which now handles all FOIA and Privacy Act requests
through the Record/Information Dissemination Section. These most recent re-engineering efforts
have resulted in the following organizational plan which will be discussed in more detail below.

(6) The mission of RIDS is to effectively plan, develop, direct, and manage responses
to request for access to FBI records and information. RIDS is responsible for providing program
and policy management pertaining to the researching, reviewing, analyzing, processing, and
classification/declassification work relating to FOIA and Privacy Act, Executive Order 12958, as
amended, Presidential, Attorney General, and FBI policies and procedures, judicial decisions,
and other Presidential and Congressional directives. RIDS also provides prepublication review
of material written by current and/or former FBI employees concerning FBI matters as mandated
by the FBI's employment agreement. RIDS currently employs 242 employees, most of whom are
Legal Administrative Specialists ("LASs"), and who are assigned among the ten (10) Units
within RIDS, whose shared function is to intake, review, process, and release information in

3

response to FOIA and Privacy Act requests.[3]  To accomplish this mission, RIDS consists of the

following ten Units: the Service Request Unit ("SRU"), two Work Process Units ("WPU"), three

Classification Units ("CU"), three Freedom of Information and Privacy Acts ("FOIPA") Units

("Disclosure Units"), and the Litigation Support Unit ("LSU")..

       (a)    The **Service Request Unit** ("SRU") is responsible for reviewing and

sorting all correspondence/incoming requests for information from the public, Congress,

Presidential Libraries, foreign governments, other federal and state agencies, and other FBI

entities (i.e., FBI field offices, Legats).  The SRU handles various initial tasks required to

"perfect" a FOIA/Privacy Act request, including sending letters to acknowledge requests,

advising a requester to provide identifying data so that an accurate records search can be made

and/or to submit a notarized signature/Privacy Act waiver, or advising a requester when no

responsive records are located; opens new requests and assigns a FOIPA Request Number; and

enters the perfected requests into the FDPS tracking system.  The Negotiation Team, also a part

of SRU, works with requesters whose requests generate a large volume of records in an attempt

to narrow the scope of responsive records and facilitate a more rapid response.  Finally, the

·Government Response Team ("GRT"), also a part of SRU, provides timely feedback to other

federal agencies and other DOJ components with regard to referrals of documents –

either sent for a consultation or for direct response to the requester – which are either FBI-

originated or contain FBI-originated information.[4]

---

[3]An additional unit, consisting of 15 LASs located at the Savannah Field Operation
Support Center, supports RIDS.

[4] The Government Response Team ("GRT") was formerly known as the "Government
Response & Prepublication Review Unit."  However, an internal reorganization recently resulted

(b)    The two **Work Process Units** ("WPUs") are responsible for preparing SRU's "perfected" requests for transfer to the three Disclosure Units. The WPUs conduct searches of the general indices for identifiable records, confirm responsive documents, stamp files for retention, forward files requiring classification review to the three Classification Units, address fee issues (other than fee waiver reviews), retrieve and forward files for scanning into FDPS, respond to status inquiries, handle administrative appeals, and maintain requests prior to their in-turn transfer to the Disclosure Units.

(c)    The three **Classification Units** ("CUs") are responsible for complying with the classification/declassification review of FBI records under Executive Order 12958, as amended, and the July 1995 DOJ Memorandum of Understanding. The CUs review documents responsive to FOIA/Privacy Act requests, criminal and civil discovery requests, Congressional and Presidential mandates, Presidential Library requests, mandatory declassification requests, Office of Inspector General Reports, and other federal agency requests in order to determine whether such material should remain classified or be declassified. In addition, the CUs review and prepare classified material for review by the Department of Justice Review Committee ("DRC").[5]

(d)    The three **FOIPA Units** ("Disclosure Units") perform the actual processing of records pursuant to the provisions of the FOIA and Privacy Act. "Processing"

_____

in shifting the GRT and its functions to the SRU, and shifting the Prepublication Review Team to the RIDS front office.

[5]    The DRC is the FBI's appellate authority with regard to the implementation and administration of Executive Order 12958, as amended, and related directives and guidelines concerning classified information. See 28 C.F.R. § 17.14 (2003).

involves a page-by-page, line-by-line review of the responsive documents to determine which, if

any, FOIA and/or Privacy Act exemptions may apply. This includes redaction of the exempt

material and notation of the applicable exemption(s) in the margins of each page and/or

preparation of deleted page information sheets when pages are withheld in their entireties (now

done electronically in FDPS). During the course of their review, the Disclosure Units consult

with other government agencies for their determination as to the releasability of their information

contained within FBI records, or refer non-FBI documents to those originating agencies for

processing and direct response. The Disclosure Units ensure that FOIA and/or Privacy Act

exemptions have been applied properly, that no releasable material has been withheld, that no

material meriting protection has been released, that all necessary classification reviews have been

completed, and that other government agency information and/or entire documents originating

with other government agencies have been properly handled.

   (e) The **Litigation Support Unit** ("LSU") is responsible for providing legal

support and administrative assistance to the FBI's Office of the General Counsel and Chief

Division Counsels and Assistant Division Counsels in the FBI's field offices, in all FOIA/Privacy

Act requests that result in federal litigation. The LSU coordinates the progress of the FBI's

response to a particular FOIA/Privacy Act request as it progresses through the units described

above, coordinates the receipt of substantive litigation-related information from involved FBI

Special Agents ("SAs") in the field offices and the operational Divisions at FBIHQ, and

coordinates the referral of documents to other DOJ components and government agencies. The

LSU prepares the administrative record, drafts both procedural and substantive declarations and

court pleadings, codes documents processed by the Disclosure Units, and drafts detailed

declarations justifying the assertion of all applicable FOIA/Privacy Act exemptions.

(7)    After SRU and WPU perfect a request, the request is sent to the "perfected backlog." To ensure fairness to all requesters and to equitably administer the deluge of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a "first in/first out" basis from within each of three queues according to sound administrative practices.[6] The FBI uses a three-queue system as a way to perfect and assign new requests.[7] The three-queue system established "multi-track" processing for requests, based on the amount of time and work involved in handling a particular request.[8] The system nevertheless preserves the principle that, within the three queues, requests are still assigned and processed on a first-in/first out basis. The placement of a request in one of the three queues depends on the total amount of material responsive to that request -- 500 pages or less ("small queue"), 501 to 2,500 pages ("medium queue"), or more than 2,500 pages ("large queue"). This standard operating procedure, coupled with the FBI's "first in/first out" policy, permits requests to be addressed in the order in which they are received, while obviating the inequities to other requesters whose interests relate only to a small number of documents. As described earlier, requesters whose requests have been placed in the large queue are given the opportunity, through contact with SRU's Negotiation Team, to reduce the scope of their requests and accelerate assignment of their requests by relocating them to a more advantageous queue.

---

[6] See 28 C.F.R. § 16.5 (a) (2003).

[7] This system went into effect on July 10, 1997, superseding the previous system of two queues (one for 100 pages or less, the other for requests greater than 100 pages).

[8] See 5 U.S.C. § 552 (a) (6) (D) (i) and 28 C.F.R. § 16.5 (b) (2001).

(8)    LASs generally work on more than one request at a time because it is not administratively efficient to work only one request to completion before proceeding to the next. Processing of a complex case may be halted midstream for a variety of reasons, such as resolving a classification issue, locating records that may be missing, or consulting with other government agencies as to the nature and propriety of releasing certain information. In the interest of efficiency during this waiting period, other requests may be processed and released. Therefore, large requests are often processed in conjunction with smaller requests in an attempt to ensure that one requester does not consume a disproportionate share of RIDS resources.

(9)    Consistent with standard administrative procedure, any records which may be referred to the FBI from other DOJ components in response to a particular request may be added to that pending FOIA/Privacy Act request. This process is an equitable way for RIDS to maintain administrative control of FOIA/Privacy Act requests. Under this system, the same LAS assigned to process a particular request will also handle the review of records referred by other DOJ components or government agencies. By ensuring continuity in the processing of FOIA requests, this system is not only fair to all persons seeking information under the FOIA, but is also administratively efficient, since the same issues presented by the referred records will already have been addressed by the LAS in processing the responsive FBI files.

**B. EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM**

(10)    The Central Records System ("CRS"), which is used by the FBI to conduct searches in response to FOIA and Privacy Act requests, enables the FBI to maintain information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and

other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the CRS are maintained at FBIHQ. Records that are pertinent to specific field offices of the FBI are maintained in those field offices.

(11)    Access to the CRS is obtained through the General Indices, which are arranged in alphabetical order. The General Indices consist of index cards on various subject matters that are searched either manually or through the automated indices. The entries in the General Indices fall into two categories:

> (a) A "main" entry -- A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.

> (b) A "reference" entry --"Reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

(12)    Access to the CRS files in FBI field offices is also obtained through the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations. Searches made in the General Indices to locate records concerning a particular subject are made by searching the subject requested in the index. FBI field offices have automated indexing functions.

(13)    On or about October 16, 1995, the Automated Case Support ("ACS") system was implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ. More than 105 million records were converted from automated systems previously utilized by the FBI. The

9

ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a) Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"), formerly known as Auxiliary Offices. When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by all FBI offices conducting or assisting in the investigation. Using a fictitious file number "111-HQ-12345" as an example, an explanation of the UCFN is as follows: "111" indicates the classification for the specific type of investigation; "HQ" is the abbreviated form used for the OO of the investigation, which in this case is FBIHQ; and "12345" denotes the individual case file number for the particular investigation.

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 92.8 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality,

10

Social Security number, address, and/or date of event.

(14)     The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ.  The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval.  Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved.  The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes.  Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

## C. SURVEILLANCE ("ELSUR") INDICES

(15)     The Electronic Surveillance ("ELSUR") indices are used to maintain information on a subject whose electronic and/or voice communications have been intercepted as the result of a consensual electronic surveillance or a court-ordered (and/or sought) electronic surveillance conducted by the FBI.  The ELSUR indices date back to January 1, 1960.  On or about October 9, 1991, the ELSUR indices were automated.  Since that time, FBIHQ and all FBI field offices have electronically generated, maintained, modified and accessed all ELSUR records.

(16)     The ELSUR indices are a separate system of records from the CRS which, prior to automation, consisted of index cards on individuals who had been the subject of a microphone or telephone surveillance by the FBI from 1960.  As stated above, the previous manual index card

11

system was converted to an automated system on or about October 9, 1991. These indices include individuals who were the (a) targets of direct surveillance, (b) participants in monitored conversations, and (c) owners, leasers, or licensors of the premises where the FBI conducted electronic surveillance. In addition to the names of individuals in the above categories, the cards in the ELSUR index contain the date the voice was monitored, a source number to identify the individual on whom the surveillance was installed, and the location of the FBI field office that conducted the monitoring.

(17)    The ELSUR indices are published as a separate records system in the Federal Register because not all names contained in the ELSUR index can be retrieved through the General Index and CRS. See 52 Fed. Reg. 8482 (1992).

(18)    The FBI field offices that have conducted electronic surveillance at any time from 1960 to the present also maintain ELSUR indices. Since January 1, 1960, the field offices have been including in their ELSUR indices – and reporting to FBIHQ for inclusion in its index – the names of all persons whose voices have been monitored through a FBI microphone installation or a telephone surveillance. The names of monitored subjects are retrievable through the FBIHQ or local field office ELSUR indices.

(19)    Until 1969, FBI field offices were also required to forward the names of all persons mentioned during monitored conversations to FBIHQ for inclusion in the FBIHQ ELSUR index. Although FBIHQ discontinued this requirement in 1969, some field offices still include the names of individuals mentioned in monitored conversations in the field office's ELSUR index. However, the names of such persons cannot be retrieved through the FBIHQ ELSUR index.

12

## PLAINTIFF'S FOIA REQUEST

### A. CORRESPONDENCE

(20)    By letters dated November 14, 2005 to FBIHQ and the U.S. Department of

Justice ("DOJ") Office of Public Affairs ("OPA"), plaintiff submitted an expedited request under

FOIA for the following agency records (including but not limited to electronic records) from

September 2001 to present believed to have originated in the FBI Office of the General Counsel :

> All documents related to matters of possible intelligence misconduct reported or
> considered for reporting to the Intelligence Oversight Board ("IOB").

Plaintiff asserted that this request  met the standard for expedited processing under applicable

DOJ regulations because it involved a "matter of widespread and exceptional media interest in

which there exist possible questions about the government's integrity which affect public

confidence." 28 C.F.R.  § 16.5(d)(1)(iv).  Plaintiff requested that it be granted "news media

representative" status and that duplication fees be waived. Plaintiff's letter to OPA justified its

request for expedition pursuant to 28 C.F.R. 16.5(d)(2).  (See Attachment A.)

(21)    By letter dated November 16, 2005, FBIHQ acknowledged plaintiff's request

and assigned it FOIPA Request Number 1032952. (See Attachment B.)

(22)    By letter dated December 23, 2005, FBIHQ responded on behalf of the FBI and

DOJ OPA and again acknowledged receipt of plaintiff's request pertaining to IOB/Misconduct

Matters, FOIPA No. 103952.  Plaintiff was advised that its request for expedited processing was

granted  pursuant to 28 C.F.R. 16.5(d)(2). Based on this decision, this case was now assigned to

the fast track processing queue and was being reviewed for release. (See Attachment C.)

(23)    By letter dated February 23, 2006, FBIHQ made the first interim release

13

pertaining to IOB Matters consisting of 238 pages reviewed and 209 pages released in response to plaintiff's FOIA request. Included in this release were documents related to IOB that were previously released to plaintiff in response to its March 29, 2005, FOIA request for information on the Patriot Act, assigned FOIPA Number 1017326. Plaintiff was advised that deletions were taken to certain documents to protect information exempt from disclosure pursuant to the provisions of the FOIA, 5 U.S.C. § 552, subsections (b) (1), (b) (2), (b) (5), (b) (6), (b) (7) (A), (b) (7) (C), and (b) (7) (E). **(See Attachment D.)** For the Court's convenience, a sample of the release consisting of two reports of potential IOB violations, is attached. **(See Attachment E.)**

(24)    By letter dated March 17, 2006, FBIHQ made a second interim release consisting of 238 pages reviewed and 233 pages released in response to plaintiff's FOIA request. Plaintiff was advised that deletions were made to certain documents to protect information that was exempt from disclosure pursuant to the provisions of the FOIA, 5 U.S.C. § 552, subsections (b) (1), (b) (2), (b) (3), (b) (6), (b) (7) (A), (b) (7) (C), (b) (7) (D) and (b) (7) (E). **(See Attachment F.)**

## B. SEARCHES FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(25)    FBIHQ initiated a search of the automated general indices to the CRS to identify any records pertaining to the relevant provisions of the Intelligence Oversight Board, Misconduct Matters and located responsive records. In addition, an Electronic Communications ("EC") was sent to all FBIHQ divisions in order to determine what, if any, records they possessed responsive to plaintiff's FOIA request. The contacted offices were asked to search for all relevant agency records in response to plaintiff's request that were created on or after March 31, 2005 and on or

14

before December 1, 2005.[9] FBI personnel searched records in their custody, control and/or possession as well as their shared and personal computer drives. Ultimately these two searches uncovered 5,500 pages.

(26)    Because this request seeks documents related to National Security, many of the responsive documents are classified in whole or in part and therefore, must be reviewed by the Document Classification Unit ("DCU"). In considering classifying a document, the DCU Legal Administrative Specialist (LAS) considers information such as, but not limited to, whether the information is already in the public domain or likely to be known or suspected by present or potential adversaries of the United States; whether information can be attributed to an intelligence source; and whether the information generally can threaten the national security of this country.

C. **REQUEST FOR EXPEDITED PROCESSING**

(27)    The FBI recognizes the importance of responding quickly to this expedited request and has been working diligently toward that goal. The 5,500 pages located during the search process clearly places the case in the large queue. As of December 23, 2005, there were 24 cases in the large queue backlog. These cases were in the backlog an average of 211 days. The decision to expedite the case moves it to the front of the line and should result in a minimum savings of approximately 211 days, or approximately seven months. The FBI has already made two releases consisting of a total of 476 pages reviewed. The FBI estimates that it will require 120 days to complete the processing of remaining documents.

---

[9] Responsive IOB documents dated prior to the dates of March 31, 2005 and December 1, 2005 were previously collected in response to EPIC's March 29, 2005 request for records concerning the Sunset Provisions of the Patriot Act.

(28)    Although the FBI is making a good faith effort to expedite processing of material,
the process has been unusually complex.  For example, the names of targets, both actual and
potential, identified within the documents, requires the disclosure LAS to determine if there is an
"open investigation" on any of these individuals.  This extra step requires 20 to 30 minutes per
name and has slowed the processing tremendously. The FBI currently is devoting more than 20
employees to this case and cannot afford additional assets being spent on this one project.

(29)    As discussed in ¶¶ 31-35, infra, the unavailability of additional employees, the
high volume of FOIA and Privacy Act requests, numerous appeals and other pending lawsuits
·with court-imposed deadlines are all factors that add to the time necessary to process this request.
Based on these factors, The FBI estimates that it will need at least 120 days to complete the
processing of remaining pages. This includes time required to review for declassification, process
the records, conduct legal review, and allow the records' owners as well as other internal units
with equities in the records to be involved in the process. This time also includes any referrals
and consultations with other agencies which might be necessary.[10] Additional reassignment of
personnel solely for the processing of this case would have a significant, deleterious effect on the
FBI's growing backlog.

(30)    In addition, it has been determined that the FBI will require an estimated
additional 120 days to produce a Vaughn Index if all 5,500 pages are included in the Vaughn
Index. If a 500-page sample of documents is provided for the Vaughn declaration, the FBI

---

[10] If during processing, the FBI  locates information within a record or an entire record
belonging to another agency, that record is referred to the other agency for either a direct
response to the requester or consultation with the FBI regarding which FOIA exemptions would
be asserted in that agency's behalf.

estimates it will only need 60 days.[11]  The FBI notes that many of the documents are similar in structure and refers back to Attachment E to illustrate that point.

## OVERVIEW OF THE FBI'S FOIA/PRIVACY ACT BACKLOG

(31)    The number of FOIA and Privacy Act requests received by the FBI has increased dramatically since the early 1980s.  At that time, the FOIPA Section had sufficient resources to process and administratively maintain a balanced flow of work, which kept the growth in the backlog to a minimum.  However, from the mid-1980s until 1996, the unavailability of additional employees and a steady, large stream of new requests increased the backlog substantially.  The number of FOIA and Privacy Act requests on hand at FBIHQ, in various stages of processing, increased from its 1985 level of 4,736 to a total of 16,244 requests in December 1996.

(32)    In the past, the backlog in the FOIPA Section has been exacerbated by the high volume of administrative appeals which require review and response by the FBI's FOIPA Section personnel.  RIDS personnel work closely with the staff of the U.S. Department of Justice, Office of Information and Privacy ("OIP") in reviewing and assisting with OIP's responses and determinations of pending appeals.  During 2005, the FBI received a total of 1,189 administrative appeals.  As of February 2006, 691 administrative appeals were pending resolution.  Inevitably, the time spent by FOIPA  personnel handling these appeals reduces the amount of time for regular processing duties.

(33)    At the present time, the FBI is involved in more than 100 pending lawsuits in various federal district and appellate courts throughout the United States.  As a result, there have

---

[11] This estimate is subject to change depending on the complexity of documents not yet processed.

been substantial litigation demands placed upon RIDS in the past several years. These lawsuits require a substantial time commitment by various RIDS personnel. At times, specific cases require the devotion of an inordinate amount of personnel and resources. For instance, from February 1997 until the Spring of 2000, Whitehurst v. FBI, Civ. A. No. 96-572 (D.D.C.) (GK), required the full-time assignment of between six (6) to twenty-five (25) Legal Administrative Specialists ("LASs") who, pursuant to both a court order and a subsequent settlement agreement, processed approximately 272,112 pages. LASs continue to work on requests stemming from this litigation and settlement agreement. .

(34)    More recently, several urgent and competing litigation deadlines have necessitated shifts in RIDS' personnel resources. For example, Judge Susan Illston issued a September 16, 2004 Memorandum Opinion and Order in Steven Homick v. DOJ, Civ. A. No. C-98-00557SI (N.D. Cal.), denying in part the FBI's motion for summary judgment, and ordering the FBI to reprocess and release approximately 12,000 pages of documents by October 15, 2004. In order to comply with Judge Illston's deadline, RIDS paralegals were shifted to assist the FOIPA Litigation Support Unit in the FBI's efforts to move for reconsideration of the September 16, 2004 Order and to seek relief from the October 15, 2004 deadline, which were mostly unavailing. As a result, the FBI had to continue its task of reprocessing the approximately 12,000 pages and meet the court-imposed deadlines. Even today, the FBI continues to be involved in an effort to reprocess selected documents. Moreover, on September 15, 2004, Judge Alvin K. Hellerstein presiding over ACLU, et al. v. DOD, et al., Civ. A. No. 04-4151 (S.D. N.Y.), ordered the FBI by October 1, 2004 (interim deadline) and October 15, 2004 (final deadline) to either produce or identify and Vaughn all documents responsive to plaintiffs' FOIA requests concerning the

18

treatment, deaths and rendition/repatriation of any individuals apprehended after September 11,

2001 who currently being held, or were formerly held in United States custody at military bases

or detention at facilities outside of the United States. This September 15, 2004 Order has

resulted in numerous RIDS employees being diverted to the review and processing of thousands

of potentially responsive pages, and to the necessary Vaughn declaration. Five additional FOIA

LASs were shifted within RIDS to assist the FOIPA LSU with this litigation. The FBI has only

recently completed the reprocessing in this case and was working on it when plaintiff's request

was received. In litigation relating to its expedited request for various information related to the

USA Patriot Act, plaintiff filed a Motion to Compel Expedition against the FBI. Judge Gladys

Kessler of this Court on November 16, 2005, ordered the FBI to complete the processing of

1,500 pages every calendar days until the processing was completed. The impact on personnel

and other cases was significant. Although the FBI completed the processing on January 13, 2006,

the Order required the dedication of an entire processing team as well as the equivalent of an

entire classification team working under intense pressure to comply. Since that time, a

significant number of experienced personnel have been lost and have not yet been replaced as

RIDS undergoes an impending transfer of its functions to Winchester, Virginia. Over time, it is

not surprising that this diversion of personnel, already strained by attrition, into multiple

litigations has had a significant impact on the FBI's FOIA backlog as well as a delaying effect on

requests assigned to and being processed by those LASs.

(35)    In the past, the FBI had repeatedly sought additional funding for the creation of

new FOIPA positions. For example, Congress appropriated funds in the 1997 fiscal budget

providing for 129 additional employees, and in the 1998 fiscal budget, providing for 239

additional employees. However, following September 11, 2001, the number of RIDS personnel has been reduced significantly due to the vital need to have FBIHQ personnel redirected towards the goal of fighting the war on terrorism. Nevertheless, despite this necessary shift in personnel resources, the FBI continues to make great strides in reducing its backlog. For example, requests in the FOIPA Section in various stages of processing between December 31, 1996 and December 31, 2005, dropped from 16,244 to 1,640 resulting in a reduction of 14,604 requests. As of December 31, 2005, RIDS had 1,640 requests in various stages of processing throughout the Section. Moreover, during this past year, the FBI has received an average of 908 requests per month. The FBI's re-engineering effort, which will be described in more detail below, has successfully reduced the FBI's backlog of requests by approximately 91 percent and it is anticipated that future totals should reflect a continuation of this downward trend.

(36)    In addition, RIDS has taken all available steps to aid in the streamlining of the work and reduction of the FOIA/Privacy Act backlog. These include the use of direct on-line computer searches to locate responsive records, the use of forms which eliminate delays associated with word processing, the formation of specific teams to target backlog issues, the development of alternative methods to handle consultations with other government agencies, and the formation of the FOIPA LSU, which handles all FOIA/Privacy Act Litigation in RIDS.

(37)    In an attempt to adapt technology to the demands of the FOIA/Privacy Act, RIDS has moved to paperless processing through its FOIPA Document Processing System ("FDPS"). The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually. RIDS is now using this system for new FOIA and Privacy Act requests.

20

## CONCLUSION

(38)    The FBI takes its responsibilities with regard to the administration of the

FOIA/Privacy Act program very seriously, and will make every effort to continue to expedite the

completion of this case.

Pursuant to 28 U.S.C. § 1746, I declare the foregoing to be true and correct and that

Exhibits A through E attached hereto are true and correct copies.

Executed this _20th_ day of March, 2006

DAVID M. HARDY

Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

21